IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PETER J. LONG,

        Plaintiff,

v.

LINDA HARRING, PETER STIEFVATER,
WAYNE OLSON AND PETER JAEGER,

        Defendants.

OPINION and ORDER

Case No. 16-cv-779-slc

Pro se plaintiff Peter Long, who is incarcerated at Thompson Correctional Center ("TCC"), is proceeding on a First Amendment claim that defendant Linda Harring retaliated against him after he began filing inmate complaints against her and other prison staff in September 2015, and that defendants Peter Stiefvater, Wayne Olson, and Peter Jaeger failed to intervene to prevent or stop the retaliation from occurring. Before the court are three motions filed by the parties: (1) defendants' motion for summary judgment, dkt. 36; (2) defendants' motion to strike Long's proposed findings of fact on the ground that he had filed them in lieu of a response to defendants' proposed findings of fact, dkt. 69; and (3) Long's motion for leave to file seventeen additional interrogatories, which he filed while the parties were briefing the summary judgment motion, dkt. 45. For the reasons stated below, I am granting the motion for summary judgment and entering summary judgment in favor of defendants. Accordingly, it is unnecessary to rule on plaintiff's motion for leave to file additional interrogatories. The motion to strike will be denied as moot because Long filed his response to defendants' proposed findings of fact on the same day that defendants' filed their motion, and defendants have had the opportunity to reply. *See* dkts. 70 and 73.

1

I find that the following facts are material and not subject to genuine dispute, unless otherwise indicated.[1]

UNDISPUTED FACTS

I. The Parties

Plaintiff Peter Long was an inmate housed at the Thompson Correctional Center (TCC) from September 9, 2015 to August 23, 2016.

At all times relevant to this lawsuit, defendants were employees at the institution. Linda Harring was a correctional sergeant, Peter Stiefvater was a captain, Wayne Olson was the superintendent from August 2013 to November 2015 and again from May 2016 to the present, and Peter Jaeger was the acting superintendent between November 2015 and May 2016. In their roles as superintendent, Olson and Jaeger served as the Inmate Complaint Reviewing Authority (RA) under the Inmate Complaint Review System (ICRS) at TCC. Stiefvater served as an Inmate Complaint Examiner (ICE).

II. Harring Issues Long Warnings and Conduct Report About Carhartt Jeans

   A. Approval for Jeans

An inmate's personal property items, such as jeans, must comply with Department of Adult Institution (DAI) policy restrictions. DAI Policy 309.20.03 allows inmates to purchase personal property items from approved vendors who comply with policy restrictions and

---

[1] Several of the almost 300 proposed findings of fact proposed by Long are not material because they involve details or events that are not relevant to the specific claims on which he was allowed to proceed. Therefore, I have considered and included only those facts that are directly related to Long's claims.

2

dictates that inmates must wear traditional-style jeans with traditional stitching and a maximum of four pockets and a watch pocket. Certain work release jobs allow inmates to wear other types of jeans, such as cargo-style jeans, which have more pockets. If these work jeans do not comply with DAI policy, then they can only be worn at work and cannot be worn inside the residential prison areas. It is normal practice for staff at TCC to write an inmate a warning for wearing clothing that does not conform with policy and then record that warning on the inmate's warning card unless the warning was only verbal.

Because Long could not find a pair of jeans in the vendor catalog that fit him, defendant Olson made an exception and allowed Sergeant Randy Lewis to order Long two pair of jeans from "Work & Wear." After Long's jeans arrived at TCC on November 11, 2015, defendant Harring completed form DOC-237 "Property Receipt/Disposition," on which she wrote "2 pr. carhartt 48x28/work release Generac only must send out if not on work release." Long signed the receipt on November 13, and Sergeant Lewis signed the form on November 14, authorizing disbursement but noting that "2 pair carhartt jeans (work release per wayne) 48" x 28"." (The parties seem to dispute whether the jeans that Long ordered were cargo-style or traditional-style. Although in response to Long's proposed findings of fact, defendants admit that the jeans Long received were a traditional relaxed fit that is permitted inside the prison, *see* dkt. 75 at ¶¶ 91-92, they suggest in other submissions that the jeans were a cargo-style not permitted inside the prison under the policy, dkt. 73 at ¶¶ 22-28. In any event, the parties agree that the jeans were ordered from an outside vendor with Olson's approval.)

On June 15, 2016, Long exchanged his old Carhartt jeans for two new pairs in the TCC property department. The new jeans were not cargo-style. The disbursement request form that Long signed for the jeans stated that they were "Carhartt 5-pocket jeans."

**B. Warnings**

On November 15, 2015, defendant Harring saw Long wearing his Carhartt jeans in the TCC dining room and issued him a verbal warning and a written warning. By themselves, warnings carry no adverse consequences: they inform rather than discipline an inmate. However, as discussed below, multiple written warnings could result in an inmate losing his seniority status for the purpose of assignment to a single cell.

After Long received the November 15 warning, he wrote an information request to Olson, asking him to instruct his staff that he was allowed to wear his jeans at TCC and during his work release. Within seven days, Olson responded to Long's request stating, "you are approved to wear the jeans at TCC, we will inform staff." (Olson says that at the time he responded to Long's request, he was not aware that the jeans were cargo-style, and that had he known this fact, he would not have approved them for Long to wear in the institution. Plaintiff disputes that assertion, stating that the jeans were not cargo-style and that Olson saw him wearing them around the prison.) Olson stopped working at the prison after this interaction and did not return until May 2016.

On November 24, 2015, Harring again saw Long wearing the jeans and issued him another written warning, even though Long showed her Olson's response to his information request. On February 13, 2016, Harring issued Long a written warning stating that Stiefvater

4

had observed Long wearing Carhartt jeans in the TCC dining room and library and warned him not to do so. (The parties dispute whether Stiefvater actually issued Long a verbal warning as Harring reported.) All three warnings appeared on Long's "Face Card" or "ID Card." (The parties dispute whether Harring told Long about certain warnings, but there is no evidence showing that Harring was required to inform Long about a written warning and the parties do not discuss how this information is relevant to Long's claims.)

### C. Conduct Report No. 2717620

When Harring saw Long wearing Carhartt jeans at TCC again on July 26, 2016, she wrote him a conduct report. Stiefvater approved a disposition of eight days of room confinement and loss of all electronics. However, after Long complained to Stiefvater and Olson and reminded them that Olson had given him permission to wear the jeans at TCC, the conduct report was dismissed. In addition, the three warnings related to Long's jeans were crossed off his face card.

## III. Harring Issues Long Conduct Report Following Room Inspection

### A. TCC Polices on Room Searches and Inspections

The TCC inmate handbook explains that room searches and room inspections may be conducted at any time, either randomly or for cause. Inmates are not allowed to have contraband in their rooms, and any contraband found during a search will be removed. When Harring searches a room for contraband, she typically leaves a search notification form (DOC-1302), but she never left a search notification form for Long.

Unlike a more extensive search for contraband, a room inspection is a cursory cleanliness check that may result in a notice that indicates what needs to be corrected. The notice cautions that "[i]f you fail a room inspection, you will be given a written warning for the first incident. . . . Repeated infractions will result in progressive disciplinary action. . . . Failure to comply with this may result in disciplinary or loss of a single cell." The policy on room inspections does not mention contraband specifically.

### B. Inspections of Long's Room

Harring inspected/searched (the parties argue about how to characterize this event) or participated in the inspection/search of Long's room on February 23, March 9, March 14, and April 25, 2016. Harring noted that Long had deficiencies during all of the inspections/searches and issued him warnings for failing them.

With respect to March 9, 2016 in particular, Harring looked inside Long's room while conducting the count. (The parties dispute whether Harring had reason to look inside the room and what she saw when she did.) When she conducted a follow-up inspection/search of Long's room, she discovered eight packages of butter, which was a violation of a TCC rule prohibiting inmates from removing items from the dining hall. (Long contends it was a search because Harring removed the contraband from his room.)

### C. Conduct Report No. 2735154

After the March 9, 2016 inspection/search of Long's room, Harring notified Stiefvater that she intended to write Long a conduct report and impose the disposition of loss of

6

seniority. According to Harring, she sought that disposition because (1) the presumptive disposition of five days room confinement was hard to enforce against someone like Long who had a problem following rules and being in unassigned areas; and (2) Long was going to lose his seniority anyway due to the significant number of warnings he had on his Face Card. (Long avers that based on his experience at TCC, room confinement was not burdensome and was the most common disposition imposed.) Stiefvater instructed Harring to write the conduct report with the disposition of five days room confinement and not the revocation of Long's seniority.

Because the incident had occurred at the end of her shift on March 9, Harring did not write up a conduct report for theft and disobeying orders until the following day, March 10. Long did not accept the disposition and filed an inmate complaint on March 10, alleging that Harring excessively searched his room and targeted him because his was the only room searched on March 9, 2016. In the complaint, Long admitted that he was "guilty of violating a TCC policy and procedure not to bring butters back to [his] cell" but emphasized that he "did [not] steal anything" because he "pay[s] $740/monthly room and board charges." Harring has written three other conduct reports against inmates for taking butter from the TCC kitchen. On March 11, 2016, Stiefvater found Long not guilty on the theft charge but guilty as to disobeying orders and punished him with five days room confinement with a loss of electronics.

**IV. Long Loses Seniority and Single Cell Assignment**

    **A. TCC Housing Policies**

TCC's "Center Rules and Responsibilities," which is dated February 2, 2015, addresses how inmates are assigned a cell or room:

> **DESCRIPTION OF LIVING QUARTERS**
>
> TCC has two housing units, the New Building (NB) and the Old Building (OB). The NB consists of 60 cells with 30 of those being double occupancy and 30 of them being single occupancy.
>
> The OB consist[s] of 16 cells independent living unit (ILU) upstairs and a 20 bunk dormitory on the main level.
>
> Upon arrival at TCC you will typically be assigned a bunk in the OB dormitory. Under normal circumstances more desirable room assignments are made based on behavior, accomplishments and motivation. Staff will approve and coordinate all bunk assignments / Reassignments. You are not allowed to switch bunks.
>
> Based on vacancies in the NB, individuals will be moved out of the dorm in the following priority; Seniority.
>
> - Center Drivers
> - Center workers who have committed to 6 months or longer working for the Center (Food Service, Maintenance or Laundry.)
> - Seniority
>
> NOTE: Staff always reserve the right to modify the order of movement.

**SINGLE CELL AND INDEPENDENT LIVING UNIT REQUIREMENTS. . .**

\* \* \*

> 3 warnings of the same offense or 2 minor conduct reports will result in being moved from your single cell or consideration of a single cell and you will be moved to the bottom of the seniority list.

Dkt. 40, exh. 6.

TCC maintained a list of the inmates' seniority and it was posted in both the old and new housing buildings during most of Long's stay at TCC. At some point after Long's cell was searched on March 9, 2016, Stiefvater ordered staff not to post the seniority list on inmate bulletin boards. Although seniority is an important factor in deciding which inmates are awarded a single cell, TCC staff check an inmate's disciplinary history, conduct record, and warning card before awarding him a single cell, in accordance with TCC rules.

**B. Long's Seniority Status**

On March 7, 2016, Long's name appeared second on the posted seniority list. Two days later, on March 9, 2016, a single cell became available in the new building. However, as of March 9, 2016, Long had received a total of nine written warnings dating back to October 23, 2015 for various rule violations, including three warnings for being in an unassigned area that had been issued by staff other than Harring. *See* dkt. 51, exh. 78 (Oct. 23, December 10, and December 19, 2015 entries). When Stiefvater reviewed Long's warning card around March 9, 2016, he determined that Long should be placed at the bottom of the seniority list because Long had too many warnings and failed inspections. Therefore, Stiefvater directed Harring to move Long to the bottom of the seniority list, resulting in Long not receiving

assignment to a single cell at that time.  Long eventually received a single cell several months later.

## V.  Long's Inmate Complaints

Prison records show that Long filed four inmate complaints between his arrival at TCC in September 2015 and the loss of seniority status in March 2016:

- On October 12, 2015, Long filed Complaint No. TCC-2015-19105, alleging that his legal mail was not being taken to the post office on the day after he deposited it in the inmate mailbox.

- Also on October 12, 2015, Long filed Complaint No. TCC-2015-19107, alleging that he was improperly denied the Dickie dungaree jeans he ordered from Union Supply.  This complaint was successful because the prison eventually reimbursed Long for the jeans.  Harring admits that she knew about this complaint.

- On December 14, 2015, Long filed Complaint No. TCC-2015-23372, alleging that Sergeant Corrie refused to disperse his two boxes of Tylenol.

- On February 25, 2016, Long filed Complaint No. TCC-2016-4113, alleging that TCC's bag lunches for inmates on work release were unhealthy and old.

None of the four complaints alleged wrongdoing by defendant Harring, and Stiefvater did not call upon Harring to investigate any of these complaints.  (The parties dispute whether Harring knew about the mail, bag lunch and Tylenol complaints:  Harring avers that she did not know about them but Long avers that he told Harring about every inmate complaint that he ever filed.)

After Long lost his seniority status on March 9, 2016, he filed three inmate complaints alleging that Harring retaliated against him for having filed inmate complaints

against her and other TCC staff. Specifically, on March 10, 2016, Long filed a complaint alleging that Harring revoked his seniority; then, on August 8, 2016, Long wrote two complaints alleging that Harring wrote him a "meritless" conduct report and warnings for wearing Carhartt jeans.

(The parties dispute whether Harring knew about these three complaints or knew about other complaints that Long allegedly filed but that Stiefvater refused to log or process, including:

> (1) a September 21, 2015 complaint that staff denied Long the use of law library computers;
>
> (2) a November or December 2015 complaint that Sergeant Corrie refused to leave Long's room when Long was being examined by Dr. Grossman at Waupun Memorial Hospital;
>
> (3) a December 27, 2015 complaint that an unknown staff member retaliated against Long for filing the complaint against Sgt. Corrie by preventing Long from receiving his canteen order; and
>
> (4) a March 7, 2016 complaint that maintenance staff switched the main television antenna so that inmates only received eight digital channels instead of 56 HDTV channels.[2] )

---

[2] As defendants note, I denied Long's requests for production of documents related to these complaints on the ground that they are not relevant to Harring's alleged retaliation. Dkt. 28 at 15. However, because Long has averred that he told Harring about every one of these complaints and Long allegedly filed them before much of Harring's alleged retaliation occurred, I will consider them as disputed evidence of Harring's knowledge of Long's complaints for the purposes of summary judgment.

ANALYSIS

I.  Summary Judgment Standard

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  All reasonable inferences are construed in favor of the nonmoving party.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*.  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

II.  First Amendment Retaliation by Harring

Long contends that Harring retaliated against him in violation of his First Amendment rights after he began filing inmate complaints in September 2015 about her behavior and the behavior of other prison staff at TCC.

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution."  *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).  For Long to succeed on his retaliation claim against Harring, he must prove that:  (1) he engaged in a

constitutionally protected activity; (2) Harring took one or more retaliatory actions against him that would deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) Long's protected activity was one of the reasons that Harring took the action she did against him. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005). If Long meets this standard, then "the burden of persuasion will shift to the defendants to prove by a preponderance of the evidence that [Harring] would have taken the same action anyway." *Johnson v. Kingston*, 292 F. Supp. 2d 1146, 1157 (W.D. Wis. 2003); *see also Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

Long has satisfied the first element of his retaliation claim because his inmate complaints qualify as constitutionally protected activity. *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015); *Hoskins*, 395 F.3d at 375. In addition, Long has raised a genuine issue of disputed fact as to whether Harring knew about his complaints. However, Long's retaliation claim falters on the next two elements.

In the amended screening order entered on December 5, 2017, dkt. 28, I found that Long identified the following specific actions by Harring as retaliatory:

- "Excessive and targeted" searches of Long's cell, particularly the one on March 9, 2016.

- Moving Long to the bottom of the TCC seniority list, which prevented him from being assigned a single cell.

- Three "meritless" written warnings issued in November 2015 and February 2016 and a "meritless" conduct report issued in July 2016 for wearing Carhartt jeans in the prison.

- A "meritless" conduct report issued in March 2016 for theft of butter and disobeying orders.

As discussed below, most of these actions were not sufficiently adverse to deter a person of ordinary firmness from filing future complaints. Even if they were, Long has failed to present sufficient evidence that his inmate complaints were one of the reasons that Harring took these actions. Although the conduct report regarding the butter and Long's loss of seniority may constitute adverse actions, the undisputed facts show that these actions would have been taken regardless of any retaliatory intent that Harring might have had against Long. I will discuss the different types of alleged retaliation separately:

**A. Cell Searches**

Long contends that Harring performed "excessive" searches of his cell, and that she disguised them as mere "inspections" by not entering them in a log as she was required to do for a search. Long also alleges that Harring's inspection of his cell on March 9, 2016 was excessive and that it rose to the level of a search because Harring was looking for and removed "contraband" (the packets of butter).

But no matter how extensive or invasive each of these inspections/searches were, they were authorized and permitted by institution policies that are enforced against all inmates. The inmate handbook makes clear that staff may conduct either inspections or more extensive searches at any time. Application of standard prison regulations do not amount to adverse actions sufficient to maintain a retaliation claim. *See, e.g.*, *West v. Kingsland*, 679 Fed. Appx. 482, 486 (7th Cir. 2017) (holding that cell search did not constitute an adverse action

where prison regulation required cells to be searched monthly if not more often) (citing *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (explaining that routine activities are not materially adverse actions suggesting retaliation)).

Long says that other inmates told him that his was the only room that Harring inspected on March 9, 2016, but this is inadmissible hearsay when offered by Long, as opposed to the declaring inmates. *See* Fed. Rs. Evid. 801(c) and 802. Long also alleges generally that his cell was searched more frequently than other inmates, but he doesn't quantify this assertion in any manner that would give it traction. In short, Long has failed to present any evidence other than his own vague accusations that he was treated differently from other inmates.

But even if we assume *arguendo* that Harring did not search any other cells on one particular day, this by itself does not prove that she was targeting Long. One of Harring's regular duties was to inspect/search inmate cells. Although Harring may not have searched any other cells on March 9, she searched other cells on other days and she has written up other inmates for caching butter in their cells. Long attempts to make Harring's search personal to him by proclaiming without support that Harring targeted him when no other staff did. Long has not presented any evidence that Harring and other staff enforced the inspection/search policy in an unfair manner. There is simply nothing here that suggests retaliation.

**B. Loss of Seniority and Single Cell**

Long contends that Harring was responsible for revoking his seniority status after she issued him a meritless conduct report for having butter in his cell.  There is no support for this contention. The undisputed facts show that Stiefvater made the decision to revoke Long's seniority.  He did so after reviewing Long's conduct history and determining that Long had received up to nine warnings. Three of these were warnings for being in an unassigned area and all three had been issued by staff members other than Harring.  Long contests the merit of at least one of these warnings, but this point is irrelevant because Long does not allege that Harring had any role in issuing the warnings that led to his loss in seniority status. As the posted rules stated, "3 warnings of the same offense or 2 minor conduct reports will result in being moved from your single cell or consideration of a single cell and you will be moved to the bottom of the seniority list."  In other words, Long would have lost seniority even if Harring had never issued Long any warnings.

In an apparent attempt to challenge Stiefvater's decision and show that there was no "single cell policy," Long cites a March 20, 2016 interview and information form in which fellow inmate Matthew Hoffman asked why staff did not seem to know about the single cell policy and Stiefvater responded that "[t]here is no policy. If you have questions or concerns about single cell speak w/a sgt." Dkt. 61, exh. 1.  It is unclear what Stiefvater meant by "no policy" but his statement does not refute the fact that TCC housing rules specifically give staff the final say in room assignments and require inmates to meet certain behavioral and security standards in order to maintain their seniority status to qualify them for a single cell (such as not having three warnings for the same offense).  Elsewhere in his submissions, Long admits that these housing rules were in effect and posted in the prison at the time his

seniority was revoked, and a review of the record confirms this fact. *See* dkt. 73 at ¶¶ 123-24. Therefore, Stiefvater's decision to revoke Long's seniority on the ground that Long had three written warnings for the same offense is consistent with the TCC housing policy and did not depend on the allegedly retaliatory warnings that Harring issued.

Long also has submitted his own affidavit and affidavits from other inmates to show that staff consistently posted the seniority list on bulletin boards at TCC and "strictly followed" it. As defendants note, these statements lack foundation because even though the inmate witnesses aver that they saw the posted lists, none of them explains how he had reason to know that staff "strictly followed" the seniority list. The parties agree that seniority was an important factor in assigning single cells, but even so, the fact that staff may have "strictly followed" the seniority list when determining who was next in line for a single cell does not mean that Stiefvater or staff would not disqualify an inmate based on his conduct or for security reasons. Prison policy made clear that "room assignments were made based on behavior, accomplishments and motivation."

### C. Warnings and Conduct Report Regarding Carhartt Jeans

Long contends that Harring issued him three unfounded warnings and a conduct report for wearing Carhartt jeans that did not violate prison clothing policies and that he had been given approval to wear. There seems to be a genuine dispute as to whether Long should have received these warnings, particularly in light of the fact that Olson acknowledged in writing at one point that Long could wear the jeans in the prison. In addition, Long's claim

that the write-ups were unfounded is bolstered by the fact that the conduct report was dismissed and the warnings were crossed off his face card. In the end, this is immaterial.

A warning by itself does not constitute an adverse action sufficient to deter a person of ordinary firmness from filing an inmate complaint. Regardless whether the warnings that Harring issued were meritorious, it is undisputed that a single warning does not result in a negative consequence for an inmate and only serves to inform an inmate of behavior that should be corrected. Long correctly points out that an inmate receiving three or more warnings for the same offense can lose seniority status, as Long did in this case. However, as explained above, the warnings that Long received from *Harring* did not result in a negative consequence for Long with respect to his seniority.

Similarly, the Court of Appeals for the Seventh Circuit has held that a single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action. *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009) (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise. . . ."). Accordingly, no reasonable jury would conclude that the subsequently-dismissed warnings and conduct report would deter a person of ordinary firmness from filing future complaints. As a matter of fact, they did *not* deter Long, who continued to file inmate complaints about various issues after receiving the warnings and conduct report.

### D. Conduct Report for Theft of Butter

The March 2016 conduct report that Harring issued to Long for taking butter from the TCC kitchen might deter a person of ordinary firmness from filing inmate complaints, but Long has not shown that Harring acted with a retaliatory motive in issuing the conduct report. Although Long does not believe that taking butter should be considered theft, he admits that he took the butter and that this violated prison rules. Accordingly, Harring's conduct report was justified and would have been issued even if Long had not filed any inmate complaints.

As with the cell searches, Long contends otherwise, claiming that Harring singled him out for discipline. However, Long has not presented any evidence that Harring ever knowingly ignored similar conduct by other inmates. To the contrary, it is undisputed that Harring has written three other conduct reports against other TCC inmates for taking butter from the kitchen. Thus, there is no evidence from which a rational factfinder could infer animus and the requisite causal link between Long's complaints and Harring's conduct report. Harring is entitled to summary judgment on Long's retaliation claim with respect to the March 2016 conduct report.

### III. Failure to Intervene Claims Against Other Defendants

Long contends that defendants Stiefvater, Olson, and Jaeger were aware of Harring's pattern of retaliation but took no steps to prevent it from occurring. However, it follows from the analysis above that these defendants cannot be liable for failing to intervene when there was no underlying constitutional violation for them to prevent. Accordingly, they are

entitled to summary judgment along with Harring. *Fillmore v. Page*, 258 F.3d 496, 506 (7th Cir. 2004).

ORDER

IT IS ORDERED that

(1) The motion for summary judgment filed by defendants Linda Harring, Peter Stiefvater, Wayne Olson, and Peter Jaeger, dkt. 36, is GRANTED.

(2) Defendants' motion to strike Long's proposed findings of fact, dkt. 69, is DENIED.

(3) Plaintiff Peter Long's motion for leave to serve seventeen additional interrogatories, dkt. 45, is DENIED as moot.

(4) The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 1st day of June, 2018.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge